## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND; and ARTHUR H. BUNTE, Jr., as Trustee, | ) ) ) ) ) ) | |
| | ) | Case No. 12-CV-3461 |
| Plaintiffs, | ) ) | Judge Guzman |
| v. | ) ) | |
| NORTHERN ILLINOIS TRANSIT, INC., an Illinois corporation, | ) ) ) | |
| Defendant. | ) ) | |

### AFFIDAVIT OF PETER PRIEDE

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) SS: |
| COUNTY OF COOK | ) |

**NOW COMES** Peter Priede and, having been fully sworn on oath, deposes and states as follows:

### FACTUAL BACKGROUND

1.    I am an adult and am otherwise competent to give evidence.

2.    I have personal knowledge with respect to the facts set forth in this Affidavit and, if called to give evidence in this matter, I would testify consistently with those facts.

-1-

F: 209576 / 06315131

3.    I am employed as the Group Manager of the Operations Accounting Group at Central States, Southeast and Southwest Areas Pension Fund ("Pension Fund") and Central States, Southeast and Southwest Areas Health and Welfare Fund ("Health and Welfare Fund") and I am familiar with the operations of the Pension Fund and the Health and Welfare Fund (collectively, the "Funds").

4.    The Pension Fund is an employee benefit plan and trust, with its principal and exclusive offices at 9377 West Higgins Road in Rosemont, Cook County, Illinois.

5.    The Pension Fund is primarily funded by contributions remitted by multiple participating employers pursuant to negotiated collective bargaining agreements with local unions affiliated with the International Brotherhood of Teamsters ("IBT") on behalf of employees of those same employers. All principal and income from such contributions and investments thereof is held and used for the exclusive purpose of providing pension benefits to participants and beneficiaries of the Pension Fund and paying the administrative expenses of the Pension Fund.

6.    The Health and Welfare Fund is an employee benefit plan and trust, with its principal and exclusive offices at 9377 West Higgins Road in Rosemont, Cook County, Illinois.

7.    The Health and Welfare Fund is primarily funded by contributions remitted by multiple participating employers pursuant to negotiated collective bargaining agreements with local unions affiliated with the International Brotherhood of Teamsters ("IBT") on behalf of employees of those same employers. All principal

-2-

F: 209576 / 06315131

and income from such contributions and investments thereof is held and used for the exclusive purpose of providing pension benefits to participants and beneficiaries of the Health and Welfare Fund and paying the administrative expenses of the Health and Welfare Fund.

8.    Arthur H. Bunte, Jr. is a Trustee and a fiduciary of the Pension Fund and brings this action in that capacity.

9.    Local Union No. 722 ("Local 722") of the IBT is a labor organization which at all times since at least May 1, 2006 has represented, for the purposes of collective bargaining, certain employees of NIT.

<u>**GOVERNING DOCUMENTS & AGREEMENTS**</u>

10.    In the regular course of its business, the Funds keep and maintain files on contributing employers, including Northern Illinois Transit, Inc. ("NIT").

11.    The Funds' files for NIT are under my dominion and control.

12.    In the regular course of its business, the Funds keep and maintain copies of collective bargaining agreements ("CBAs") executed by or on behalf of participating employers which require the payment of contributions to the Funds, including CBAs executed by NIT.

13.    In the regular course of business, the Funds keep and maintain copies of participation agreements executed by or on behalf of participating employers that require the payment of contributions to the Funds, including a participation agreement executed by NIT.

-3-

## I.      The Articles of Construction Agreements.

14.      On June 16, 2006, the Funds received an Articles of Construction Agreement for the period of May 1, 2006 through April 30, 2010 that was negotiated by a multiemployer bargaining association known as the Associated General Contractors of Illinois and the Illinois Conference of Teamsters on behalf of various local unions, including Local Union 722 ("Local 722") ("2006 CBA").

15.      On June 15, 2009, the Funds received a signature page indicating that NIT was included as a participating employer in the 2006 CBA.

16.      A true and correct copy of the 2006 CBA is attached hereto as Exhibit 1.

17.      Under Article 12 of the 2006 CBA, Employers agreed to make contributions to the Pension Fund on behalf of covered employees and to "abide and be bound by appropriate trust agreements necessary for the administration of the [Pension] Fund...."

18.      Under Article 11 of the 2006 CBA, Employers agreed to contribute to the Health and Welfare Fund "for each hour worked by each employee covered by this Agreement during the life of this Agreement."

19.      Article 31 of the 2006 CBA also provides, with respect to the duration of the agreement:

> The Agreement shall become effective as of the 1st day of May, 2006 and shall remain in full force and effect until the 30th day of April, 2010 and each year thereafter unless written notice of termination or desired modifications is given at least sixty (60) days up to ninety (90) days prior to

-4-

F: 209576 / 06315131

the expiration date of the contract by either of the parties
hereto.

20.     Under Article 3 of the 2006 CBA, NIT agreed that its employees would
"work within the bargaining unit that is the subject of this agreement" and "pay the
periodic dues of the Local Union having jurisdiction for representation purposes over
the geographical area within which such persons work a majority of the time, figured
on a month by month basis."

21.     On June 23, 2010, the Funds received the Articles of Construction
Agreement between the Associated General Contractors of Illinois and the Illinois
Conference of Teamsters for the period May 1, 2010 through July 31, 2011 ("2010 CBA").
A true and correct copy of the 2010 CBA is attached hereto as Exhibit 2.

22.     Under Article 12 of the 2010 CBA, Employers agreed to make
contributions to the Pension Fund on behalf of covered employees and to "abide and be
bound by appropriate trust agreements necessary for the administration of the
[Pension] Fund...."

23.     Under Article 11 of the 2010 CBA, Employers agreed to contribute to the
Health and Welfare Fund "for each hour worked by each employee covered by this
Agreement during the life of this Agreement."

24.     Article 32 of the 2010 CBA also provides, with respect to the duration of
the agreement:

> The Agreement shall become effective as of the 1st day of
> May, 2010 and shall remain in full force and effect until the
> 31st day of July, 2011 and each year thereafter unless written

-5-

notice of termination or desired modifications is given at least sixty (60) days up to ninety (90) days prior to the expiration date of the contract by either of the parties hereto.

25.     Article 3 of the 2010 CBA requires that participating employees pay union dues to their respective Local Unions.

26.     On June 16, 2012, the Funds received the Articles of Construction Agreement between the Associated General Contractors of Illinois and the Illinois Conference of Teamsters for the period May 1, 2012 through April 30, 2014 ("2012 CBA").  A true and correct copy of the 2012 CBA is attached hereto as Exhibit 3.

27.     Under Article 12 of the 2012 CBA, Employers agreed to make contributions to the Pension Fund on behalf of covered employees and to "abide and be bound by appropriate trust agreements necessary for the administration of the [Pension] Fund…."

28.     Under Article 11 of the 2012 CBA, Employers agreed to contribute to the Health and Welfare Fund "for each hour worked by each employee covered by this Agreement during the life of this Agreement."

29.     Article 32 of the 2012 CBA also provides, with respect to the duration of the agreement:

The Agreement shall become effective as of the 1st day of May, 2012 and shall remain in full force and effect until the 30th day of April, 2014 and each year thereafter unless written notice of termination or desired modifications is given at least sixty (60) days up to ninety (90) days prior to the expiration date of the contract by either of the parties hereto.

-6-

30.     Article 3 of the 2012 CBA requires that participating employees pay union dues to their respective Local Unions.

**II.     The Participation Agreement.**

31.     On or about February 27, 2009, NIT entered into a Participation Agreement with Local 722 ("Participation Agreement").

32.     A true and correct copy of the Participation Agreement is attached hereto as Exhibit 4.

33.     The Participation Agreement provides in Paragraph 1:

> The Union and the Employer agree to be bound by the Trust Agreement(s) of the Pension Fund and/or the Health and Welfare Fund, all rules and regulations presently in effect or subsequently adopted by the Trustees of the Fund(s) and accept the respective Employer and Employee Trustees and their successors.

34.     The Participation Agreement provides in Paragraph 5:

> This Agreement and the obligation to pay contributions to the Fund(s) will continue after the termination of a collective bargaining agreement and during a strike except no contributions shall be due during a strike unless the Union and the Employer mutually agree in writing otherwise. This Agreement and the Employer's obligation to pay contributions shall not terminate until a) the Trustees decide to terminate the participation of the Employer and provide written notice of their decision to the Employer by specifying the date of termination of participation or b) the Employer is no longer obligated by a contract or statute to contribute to the Fund(s) and the Fund(s) have received written notice directed to the Fund(s) Contracts Department at the address specified above sent by certified mail with return receipt requested which describes the reason why the Employer is no longer obligated to contribute or c) the date the NLRB certifies the result of an election that terminates

-7-

the Union's representative status or d) the date the Union's representative status terminates through a valid disclaimer of interest. In the event the Employer participates in both the Pension Fund and the Health and Welfare Fund and the termination referred to in a) or b) relates only to one Fund, then this agreement shall remain in effect with respect to the other Fund. In the event of an NLRB election or disclaimer of interest referred to in c) or d) relates to only part of the bargaining unit, this Agreement shall remain in effect with respect to the remainder of the bargaining unit.

35. Through the date of the filing of this Affidavit, NIT has not provided the Funds with notice of termination in accordance with the Participation Agreement.

36. The Participation Agreement provides in Paragraph 9:

…. In the event of a delinquency, a) the Employer shall be obligated to pay interest on the monies due to the Fund(s) from the date payment was due to the date when payment is made, together with all expenses of collection incurred by the Fund(s) from the date when payment was due to the date when payment is made, together with all expenses of collection incurred by the Fund(s), including, but not limited to, attorneys' fees and costs and b) at the option of the Trustees or their delegated representative, the payment of contributions that accrue after the Employer has become delinquent shall be accelerated so that the contributions owed for each calendar week (Sunday through Saturday) shall be due the following Monday….

37. The Participation Agreement provides in Paragraph 14: "…. To the extend there exists any conflict between any provisions of this Participation Agreement and any provisions of the collective bargaining agreement, the Participation Agreement shall control."

### III.    The Funds' Trust Agreements.

38. The Pension Fund is created by, and governed by, a Trust Agreement.

-8-

F: 209576 / 06315131

39.     A true and correct copy of the Pension Fund Trust Agreement is attached hereto as Exhibit 5.

40.     The Health and Welfare Fund is also created by, and governed by, a Trust Agreement.

41.     A true and correct copy of the Health and Welfare Fund Trust Agreement is attached hereto as Exhibit 6.

42.     The Trust Agreements provide, at Article I, Section 1, that:

> Each Employer shall remit continuing and prompt contributions to the Trust Fund as required by the applicable collective bargaining agreement to which the Employer is a party, applicable law and all rules and requirements for participation by Employers in the Fund . . . .

43.     The Trust Agreements provide, at Article III, Section 1, that:

> [T]he obligation to make such contributions shall continue (and cannot be retroactively reduced or eliminated) after termination of the collective bargaining agreement until the date the Fund receives a) a signed contract that eliminates or reduces the duty to contribute to the Fund or b) written notification that the Employer has lawfully implemented a proposal to withdraw from the Fund or reduce its contributions at the above-specified address. The obligation to make such contributions shall continue during periods when the collective bargaining agreement is being negotiated, but such contributions shall not be required in case of strike after contract termination, unless the parties mutually agree otherwise.

44.     Through the date of the filing of this Affidavit, NIT has not provided the Funds with written notice indicating that its duty to contribute to the Funds has ended or that it has lawfully implemented a bargaining proposal that does not comtemplate

F: 209576 / 06315131

contributions to the Funds. Further, NIT has not provided the Funds with a contract that eliminates the duty to contribute to the Funds.

45. Effective February 15, 2010 through the present, Article XIV Section 4 of the Pension Fund's Trust Agreement provides, in part, as follows:

> Non-payment by an Employer of any moneys due shall not relieve any other Employer from its obligation to make payment. In addition to any other remedies to which the parties may be entitled, an Employer shall be obligated to pay interest on any contributions, withdrawal liability and/or other moneys due to the Trustees from the date when the payment was due to the date when the payment is made, together with all expenses of collection incurred by the Trustees, including, but not limited to, attorneys' fees and such fees for late payment as the Trustees determine and as permitted by law. The interest payable by an Employer with respect to past due contributions and/or other money (other than withdrawal liability) prior to the entry of a judgment, shall be computed and charged to the Employer (a) at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by JPMorgan Chase Bank, NA for the fifteenth (15th) day of the month for which the interest is charged, or (b) at an annualized interest rate of 7.5% (whichever is greater). ... Any judgment against an Employer for contributions and/or withdrawal liability owed to this Fund shall include the greater of (a) a doubling of the interest computed and charged in accordance with this section or (b) single interest computed and charged in accordance with this section plus liquidated damages in the amount of 20% of the unpaid contributions and/or withdrawal liability. The interest rate after entry of a judgment against an Employer for contributions and/or other amounts due (other than withdrawal liability) shall be due from the date the judgment is entered until the date of payment, shall be computed and charged to the Employer on the entire judgment balance (a) at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by JPMorgan Chase Bank, NA for the fifteenth (15th) day of the

F: 209576 / 06315131

month for which the interest is charged, or (b) at an annualized interest rate of 7.5% (whichever is greater), and such interest shall be compounded annually.

46.     For the relevant periods prior to February 15, 2010, Article XIV Section 4

of the Pension Fund's Trust Agreement provided, in relevant part, as follows:

Non-payment by an Employer of any moneys due shall not relieve any other Employer from its obligation to make payment. In addition to any other remedies to which the parties may be entitled, an Employer shall be obligated to pay interest on any contributions and/or other moneys due to the Trustees from the date when the payment was due to the date when the payment is made, together with all expenses of collection incurred by the Trustees, including, but not limited to, attorneys' fees and such fees for late payment as the Trustees determine and as are permitted by law. The interest payable by an Employer, in accordance with the preceding sentence, shall be computed and charged to the Employer at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by Chase Manhattan Bank (New York, New York) for the fifteenth (15th) day of the month for which the interest is charged. Any judgment against an Employer for contributions owed to this Fund shall include the greater of (a) a doubling of the interest computed and charged in accordance with this section or (b) single interest computed and charged in accordance with this section plus liquidated damages in the amount of 20% of the unpaid contributions. The interest rate after entry of a judgment against an Employer for contributions shall be due from the date the judgment is entered until the date of payment, shall be computed and charged to the Employer on the entire judgment balance at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by Chase Manhattan Bank (New York, New York) for the fifteenth (15th) day of the month for which the interest is charged and shall be compounded annually.

-11-

47.     Article 11 Section 4 of the Health and Welfare Fund Trust Agreement also contains (and contained) a provision that is (and was) identical to the provisions quoted in the above paragraphs 44 and 45, except there are no references to "withdrawal liability" in the Health and Welfare Fund Trust Agreement provision.

## OPERATIVE EVENTS

48.     Under Paragraph 9 of the Participation Agreement and the Funds' rates, NIT is required to self-report to the Funds the work history of eligible employees, which the Funds use in turn to prepare monthly bills and to determine benefit eligibility.

49.     The self-reporting system requires participating employers like NIT to identify those employees for whom contributions are owed and requires the employers to identify the weeks and/or days worked by the eligible employees ("work history").

50.     Under the Participation Agreement, on or before the 15th day of every month, participating employers like NIT are required to pay all contributions owed for the prior month.

51.     From October 2009 through the present, the Funds have not received self-reported work history of eligible employees from NIT, except on January 7, 2011 they received self-reported work history from NIT for the period of August 2010 through November 2010.  Attached as Exhibit 7 is a true and correct copy of the work history reported by NIT from August 2010 through November 2010.

52.     According to the work history provided by NIT for the period August 2010 through November 2010, NIT owes the following amounts to the Pension Fund:

-12-

| Month | Weeks Reported | Rate | Amount Due |
|---|---|---|---|
| August 2010 | 8 weeks | $162.50/week | $1,300.00 |
| September 2010 | 11 weeks | $162.50/week | $1,787.50 |
| October 2010 | 14 weeks | $162.50/week | $2,275.00 |
| November 2010 | 2 weeks | $162.50/week | $325.00 |
| **Total** | **35** | **$162.50/week** | **$5,687.50** |

53.     According to the work history provided by NIT for the period August 2010 through November 2010, NIT owes the following amounts to the Health and Welfare Fund:

| Month | Hours Reported | Rate | Amount Due |
|---|---|---|---|
| August 2010 | 296 hours | $9.05/hour | $2,678.80 |
| September 2010 | 432.25 hours | $9.05/hour | $3,911.86 |
| October 2010 | 421.75 hours | $9.05/hour | $3,816.84 |
| November 2010 | 70.5 hours | $9.05/hour | $638.03 |
| **Total** | **1,220.50 hours** | **$9.05/hour** | **$11,045.53** |

54.     NIT has not paid the Pension Fund the $5,687.50 contributions or the Health and Welfare Fund $11,045.53 in contributions that it owes in accordance with the work history that it reported for the period August 2010 through November 2010. In fact, in November 2009, NIT stopped paying monthly contributions to the Funds, with

-13-

the exception of two payments of $500.00 made on February 4, 2011 and March 4, 2011, respectively.

55.    The Funds have not received notice from NIT that it has terminated its participation in the CBAs in accordance with the Participation and Trust Agreements.

## AUDIT FINDINGS AND DAMAGES

56.    Pursuant to Paragraph 10 of the Participation Agreement and Article III, Section 6 of the Trust Agreements, the Funds are permitted to audit work history and payroll records of participating employers' records in order to verify the accuracy and completeness of the reported employee work history submitted as part of the self-reporting system.

57.    The Funds audited NIT's records to verify the employee work history reported and/or reportable to the Funds by NIT for the period of May 10, 2009 through July 14, 2012.

58.    The audit of NIT's records for the period of May 10, 2009 through July 14, 2012 revealed that NIT failed to accurately report work history and pay all of the contributions (and interest due thereon) owed to the Funds.

59.    Consequently, through February 6, 2013, NIT owes the Pension Fund contributions in the amount of $32,642.60 ($26,955.10 in contributions owed based on audit findings plus 5,687.50 in contributions owed based on reported work history). Likewise, NIT owes the Health and Welfare Fund contributions in the amount of $47,993.37 ($37,947.84 of which is based on audit findings in contributions owed based

-14-

on audit findings plus $10,045.53 in contributions owed based on reported work history). Of the $26,955.10 in audit contributions owed to the Pension Fund, $9,750.00 relate to the period of May 20, 2009 through 2010 and the remaining audit contributions relate to the 2011 through 2012 audit period. Of the $37,947.84 in audit contributions owed to the Health and Welfare Fund, $19,020.84 relate to the audit period of May 20, 2009 through 2010 and the remaining audit contributions relate to the 2011 and 2012 audit period.

60. The initial audit findings upon which the Health and Welfare Fund were $38,984.32. However, during the course of discovery, NIT presented evidence of disputes for a portion of these findings. The Funds reviewed its files, concurs with NIT's assertions regarding the disputed findings, and has reversed those findings, now claiming only $37,947.84 from the Health and Welfare Fund in audit contributions.

61. Pursuant to Article XIV, Section 4 of the Trust Agreements and Paragraph 9 of the Participation Agreement, the Funds are entitled to the following relief when it prevails in an action, like the present one: (a) the principal amount of any unpaid contributions; (b) interest on those unpaid contributions at a rate specified in the Trust Agreement; (c) an amount equal to the greater of the interest, or liquidated damages as provided under the Plan in an amount not in excess of twenty percent (20%) of the unpaid contributions; and (d) reasonable attorneys' fees and costs.

62. Pursuant to Article XIV, Section 12 of the Pension Fund's Trust Agreement, Article XI, Section 11 of the Health and Welfare Fund's Trust Agreement,

-15-

and Paragraph 10 of the Participation Agreement, NIT is required to pay all audit fees and costs incurred by the Funds in connection with the audit of NIT's records.

63. Through February 6, 2013, NIT owes interest to the Pension Fund on the total unpaid contributions in the amount of $4,534.41.

64. Through February 6, 2013, NIT owes interest to the Health and Welfare Fund on the total unpaid contributions in the amount of $7,372.28.

65. Pursuant to the terms of the Funds' Trust Agreements, the Funds are entitled to the greater of doubled interest or liquidated damages in the amount of twenty percent (20%) of unpaid employer contributions.

66. Because 20% of the contribution amount ($32,642.60) owed to the Pension Fund is $6,528.52 and the unpaid accrued interest is $4,534.41 NIT also owes the greater amount of $6,528.52 to the Pension as liquidated damages.

67. Because 20% of the contribution amount ($47,993.37) owed to the Health and Welfare Fund is $9,598.67 and the unpaid accrued interest is $7,372.28 NIT also owes the greater amount of $9,598.67 to the Health and Welfare as liquidated damages.

68. The total audit fees and costs incurred in the audit of NIT's records is $7,656.50.

69. Consequently, as a result of NIT's failure to pay all of the contributions owed to the Pension Fund, as of February 6, 2013 NIT is indebted to the Pension Fund in the total amount of $47,533.78 exclusive of attorney's fees and costs, and expressed as follows:

-16-

| | |
|---|---|
| Contributions: | $32,642.60 |
| Interest (2/6/13): | $4,534.41 |
| Liquidated Damages: | $6,528.52 |
| Audit fees: | $3,828.25 |
| Total: | $47,533.78 |

70.     As a result of NIT's failure to pay all of the contributions owed to the Health and Welfare Fund, as of February 6, 2013 NIT is indebted to the Health and Welfare Fund in the total amount of $68,792.57 exclusive of attorney's fees and costs, and expressed as follows:

| | |
|---|---|
| Contributions: | $47,993.37 |
| Interest (2/6/13): | $7,372.28 |
| Liquidated Damages: | $9,598.67 |
| Audit fees: | $3,828.25 |
| Total: | $68,792.57 |

**FURTHER AFFIANT SAYETH NAUGHT.**

Peter Priede

Subscribed and sworn before me, a
Notary Public of the State of Illinois,
this 6th day of February, 2013.

Notary Public

OFFICIAL SEAL
DEBBIE R BOLDEN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/05/13

-17-

F: 209576 / 06315131