**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND and ARTHUR H. BUNTE, as Trustee, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 12 C 3461 |
| v. | ) ) | Judge Ronald A. Guzmán |
| NORTHERN ILLINOIS TRANSIT, INC., | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Central States, Southeast and Southwest Area Pension Fund ("Pension Fund"), Central States, Southeast and Southwest Area Health and Welfare Fund ("Health and Welfare Fund) (collectively, the "Plaintiffs" or the "Funds"), and Arthur H. Bunte, Jr. as Trustee sued Northern Illinois Transit, Inc. ("NIT") under § 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1132. Plaintiffs have filed a motion for summary judgment. For the reasons stated herein, the motion is granted.

## FACTS

**I.      The Parties**

NIT is an Illinois corporation. (Pls.' LR 56.1 Stmt. ¶ 6.) The Funds are employee benefit plans and trusts funded by contributions from multiple employers according to: (1) collective bargaining agreements; (2) trust agreements that govern the Funds; and (3) participation agreements with local unions. (*Id.* ¶¶ 1-4.)

**II.     The Agreements**

### A. Collective Bargaining Agreement

In 2006, NIT signed a pre-existing, statewide collective bargaining agreement (the "2006 CBA"). (*Id.* ¶¶ 10-12.) The 2006 CBA was negotiated by the Associated General Contractors of Illinois and the Illinois Conference of Teamsters on behalf of certain Illinois-based unions, including Local Union 722 of the International Brotherhood of Teamsters ("Local 722"). (*Id.* ¶¶ 10–11.) Under the 2006 CBA, NIT agreed to make contributions to the Funds on behalf of its eligible employees. (*Id.* ¶¶ 12–13.) The 2006 CBA contains an "evergreen clause" that extends the duration of the agreement if notice of termination or modification is not provided to the parties prior to its expiration. (*Id.* ¶ 14.) This evergreen clause provides that the CBA:

> [S]hall become effective as of the 1st day of May, 2006 and shall remain in full force and effect until the 30th day of April 2010 and each year thereafter unless written notice of the termination or desired modifications is given at least sixty (60) days up to ninety (90) days prior to the expiration date of the contract by either of the parties hereto.

(*Id.*) Neither NIT nor Local 722 has sent a written notice of termination or modification of the 2006 CBA to the other party. (*Id.* ¶ 27.)

### B. Trust Agreements

The Funds' governing Trust Agreements require employers to "remit continuing and prompt contributions to the Trust Fund as required by the applicable collective bargaining agreement to which the [e]mployer is a party, applicable law and all rules and requirements for participation by [e]mployers in the Fund." (*Id.* ¶ 38.) Furthermore, Article III, Section 1 of the Funds' Trust Agreements states:

> [T]he obligation to make such contributions shall continue (and cannot be retroactively reduced or eliminated) after termination of the collective bargaining agreement until the date the Fund receives a) a signed contract that eliminates or reduces the duty to contribute to the Fund or b) written notification that the Employer has lawfully implemented a proposal to withdraw from the Fund or

reduce its contributions at the above-specified address. The obligation to make such contributions shall continue during periods when the collective bargaining agreement is being negotiated, but such contributions shall not be required in case of strike after contract termination, unless the parties mutually agree otherwise.

(*Id.* ¶ 39.) To date, NIT has neither provided the Funds with a contract that eliminated or reduced the obligation to pay contributions nor sent written notice to the Funds that NIT has lawfully implemented a proposal to withdraw or reduce contributions to the Funds. (*Id.* ¶ 40.)

### C. Participation Agreement

On February 27, 2009, NIT entered into a Participation Agreement with Local 722 in which it agreed to: (1) submit monthly reports of hours worked by covered employees, which the Funds use to prepare monthly bills and determine employee benefit eligibility; and (2) pay contributions to the Funds for each hour worked by eligible employees in accordance with the 2006 CBA's negotiated rates. (*Id.* ¶¶ 30–33, 61–62.) The Participation Agreement's duration clause provides in relevant part:

> This Agreement and the Employer's obligation to pay contributions shall not terminate until . . . the Employer is no longer obligated by a contract or statute to contribute to the Fund(s) and the Fund(s) have received written notice directed to the Fund(s) Contracts Department at the address specified above sent by certified mail with return receipt requested which describes the reason why the Employer is no longer obligated to contribute . . . .

(*Id.* ¶ 32.) Moreover, Paragraph 1 of the Participation Agreement provides that the "Union and the Employer agree to be bound by, and hereby assent to, all of the terms of the Trust Agreement(s) creating [the Pension Fund]." (*Id.* ¶ 31.)

## III. Unpaid Fund Contributions

NIT stopped making contributions to the Funds beginning in November 2009, with the exception of a $500.00 payment to the Health and Welfare Fund in February 2011 and an additional $500.00 payment to the Health and Welfare Fund in March 2011. (*Id.* ¶ 52.) NIT's President, Linda Bushman, testified at her deposition that NIT stopped paying into the Funds because the company lacked the money to do so. (*Id.* ¶¶ 27, 52; Ex. B, Bushman Dep. 19–20.)

### A.     Unpaid Contributions Based on Reported Work History

Pursuant to Paragraph 9 of the Participation Agreement, NIT is required to submit the work history of eligible employees to the Funds. (Priede Aff., Dkt. # 31, ¶ 48.) From October 2009 to the present, however, NIT has not submitted the work history of eligible employees to the Funds, other than on January 7, 2011, when the Funds received work history from NIT for the period of August 2010 through November 2010. (*Id.* ¶ 51.) According to this limited reported work history, NIT employees eligible for Pension Fund contributions worked a total of 35 cumulative weeks between August 2010 and November 2010. (*Id.* ¶ 52.) Based on a contribution rate of $162.50 per week as set forth in the 2006 CBA, the Plaintiffs allege that NIT owes $5,687.50 to the Pension Fund for the period between August 2010 and November 2010. (*Id.*) Furthermore, NIT self-reported a cumulative total of 1,220.50 hours worked by employees eligible for Health and Welfare Fund contributions between August 2010 and November 2010. (*Id.* ¶ 53.) Based on a contribution rate of $9.05 per hour as set forth in the 2006 CBA, the Plaintiffs argue that NIT owes $11,045.53 to the Health and Welfare Fund for the period between August 2010 and November 2010. (*Id.*)

### B.     Unpaid Contributions Based on Unreported Work History Based on the Funds' Audit

Under Paragraph 10 of the Participation Agreement and Article II, Section 6 of the Trust Agreements, the Funds are permitted to audit the work history and payroll records of NIT. (*Id.* ¶

4

56.) Given that NIT failed to consistently submit its employees' work history and pay contributions, the Funds audited NIT's records for the period of May 10, 2009 through July 14, 2012. (Pls.' LR 56.1 Stmt. ¶¶ 55–56.) The audit revealed that NIT failed to accurately report employee work history and pay contributions to the Funds for eligible employees. (Priede Aff., Dkt. # 31, ¶ 56.)

According to the audit, NIT failed to report the following work history to the Pension Fund: (1) a cumulative total of 60 weeks worked during 2009-10 by eligible employees, and (2) a cumulative total of 93 weeks worked during 2011-12 by eligible employees. (Pls.' Rep. Br. 13.) Taking into consideration the $162.50/week rate for the Pension Fund as set forth in the 2006 CBA, the Pension Fund asserts that, through February 6, 2013, NIT owes $24,862.60 to the Pension Fund based on unreported work history for eligible employees. (*Id.*)

Moreover, according to the Funds' audit, NIT failed to report the following work history to the Health and Welfare Fund: (1) a cumulative total of 2,094.50 hours worked by eligible employees during 2009-10, and (2) a cumulative total of 2,050.00 hours worked by eligible employees in 2011-12. (*Id.*) In light of the $9.05/hour rate as established by the 2006 CBA, the Plaintiffs allege that NIT is obligated to pay $37,507.73 into the Health and Welfare Fund. (*Id.*)

### C. Total Alleged Unpaid Contributions

Thus, through February 6, 2013, the Plaintiffs allege that NIT owes $30,550.10 in contributions to the Pension Fund ($5,687.50 based on reported work history and $24,862.60 based on audit findings) and $47,553.26 to the Health and Welfare Fund ($10,045.53 based on reported work history, plus $37,507.73 based on audit findings, less $1,000 due to payments made in February 2011 and March 2011).

NIT challenges the Court's jurisdiction as well as the amounts sought by the Funds.

## ANALYSIS

I. **Summary Judgment Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). In order to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party may not merely rest upon the allegations or details in its pleadings, but instead, must set forth specific facts showing there is a genuine issue for trial. *Id.* To survive a motion for summary judgment, the nonmoving party must establish that a reasonable jury could return a verdict in its favor. *Fitzgerald v. Santoro*, 707 F.3d 725, 731 (7th Cir. 2013). When considering a summary judgment motion, the court will view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *James v. Hyatt Regency Chi.*, 707 F.3d 775, 779 (7th Cir. 2013).

II. **This Court has Subject Matter Jurisdiction under ERISA to Enforce NIT's Obligation to Pay Contributions to the Funds**

NIT claims this Court does not have jurisdiction to determine whether NIT had a continuing obligation to make contributions to the Funds following April 30, 2010, the date on which NIT alleges the 2006 CBA expired, relying on *Laborers Health & Welfare Trust Fund for Northern Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539 (1988). In *Advanced Lightweight*, the Supreme Court distinguished between a company's contractual and statutory obligation to pay contributions to employee pension funds and concluded that once a collective bargaining agreement expires, a pension fund, *absent any other contractual agreements*, is

limited to an unfair labor practice claim before the National Labor Relations Board ("NLRB") to collect contributions. *See id.* at 543 n.4 (emphasis added).

Nonetheless, as discussed in more detail below, NIT's reliance on *Advanced Lightweight* is misplaced for two reasons. First, contrary to NIT's contention, the 2006 CBA has not yet expired due to the "evergreen clause." Second, even assuming the 2006 CBA had expired on April 30, 2010, this Court has subject matter jurisdiction to enforce the payment obligations based on the Participation and Trust Agreements.

### A. This Court Has Subject Matter Jurisdiction because the 2006 CBA Has Not Expired

Federal district courts have exclusive jurisdiction over civil suits brought by pension plan participants, beneficiaries, and fiduciaries to enforce an employer's duty to pay contributions to pension funds pursuant to ERISA § 515. 29 U.S.C. § 1132(e)(1). Section 515 of ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the term of a collectively bargained agreement shall, to the extent not inconsistent with the law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Thus, ERISA § 515 renders an employer liable for delinquent contributions that it is required to make under the terms of a collective bargaining agreement *or* a multiemployer pension plan.

According to its plain language, the 2006 CBA remained in full force and effect from May 1, 2006, until April 30, 2010, *and* for subsequent one-year terms *unless* either NIT or Local 722 provided a written notification of termination to the other at least sixty days, but no more than ninety days, prior to the contract's expiration date. (Pls.' LR 56.1 Stmt. ¶ 14.) As Bushman stated in her deposition: (1) neither NIT nor Local 722 has sent a notice to cancel the 2006 CBA;

(2) it was her understanding that NIT remained bound by the contribution obligations outlined in the 2006 CBA beyond April 30, 2010; and (3) NIT stopped making payments to the Funds because of financial indigence. (*Id.*; Ex. B, Bushman Dep. 20, 23–24, 29.) Thus, the 2006 CBA remains in full force and effect because neither party has sent the 2006 CBA-required written notice of termination. *See Contempo Design, Inc. v. Chic. & Ne. Ill. Dist. Council of Carpenters*, 226 F.3d 536, 546 (7th Cir. 2000) ("[N]either the Union nor [Employer] provided written notice to the other party at least three months prior to the expiration of the [collective bargaining agreement], [so] the automatic renewal provision went into effect"); *Cent. States, Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Mich., Inc.*, 737 F. Supp. 2d 952, 956–57 (N.D. Ill. 2010) (holding that the only way to terminate the automatic annual renewal of a collective bargaining agreement was to provide written notice to the other party).

### B. This Court Has Subject Matter Jurisdiction to Enforce the Participation and Trust Agreements

Assuming *arguendo* that the 2006 CBA has expired, this Court has subject matter jurisdiction under ERISA §§ 502 and 515 because NIT has a contractual obligation, independent of the 2006 CBA, to pay contributions to the Funds pursuant to the Participation Agreement and the Trust Agreements. The Participation Agreement states in relevant part that:

> This Agreement and the Employer's obligation to pay contributions shall not terminate until . . . the Employer is no longer obligated by a contract or statute to the Fund(s) and the Fund(s) have received written notice directed to the Fund(s) Contract Department at the address specified above sent by certified mail with return receipt requested which describes the reason why the Employer is no longer obligated to contribute. . . .

(Pls.' LR 56.1 Stmt. ¶ 32.) The Trust Agreements contain a similar provision. (*Id*. ¶ 39.) Despite these provisions, NIT argues that because the Participation Agreement defines "Covered Employee" as "any full-time or part-time employees *covered by a collective bargaining*

8

*agreement* requiring contributions to the Funds," then its duty to contribute is contingent on the existence of an unexpired collective bargaining agreement. But the Seventh Circuit has rejected a similar argument. In *Cent. States, Se. & Sw. Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663 (7th Cir. 2005), the pension fund sued for withdrawal liability after one of the defendant's subsidiaries ended operations. The pension fund argued that withdrawal had occurred in 1997 (thus increasing the withdrawal liability) while the defendant contended the withdrawal happened in 1998. *Id*. at 672. Specifically, the pension fund argued that the participation agreement "conditioned" the subsidiary's duty to contribute on the ongoing viability of the local union, and because the local union had been decertified (and the collective bargaining agreement terminated) in 1997, the subsidiary's contribution obligations also ceased at that time. *Id*. In support of its position, the pension fund pointed to the following language in the participation agreement: "[T]he Union and the Employer have entered into a collective bargaining agreement which provides for participation in [the pension fund] in order to obtain . . . benefits for employees . . . *represented by the Union* and employed by the Employer." *Id*. (emphasis added). The pension fund asserted that because the local union had been decertified, the employees were no longer "represented by the Union," and therefore, the participation agreement did not provide a basis for contribution obligations after decertification. *Id*.

The Seventh Circuit rejected this argument, stating that the pension fund's reading of the participation agreement "could not be squared with the notice clause." *Id*. According to the Seventh Circuit, the notice clause of the participation agreement provided that the subsidiary's contribution obligations would continue until it gave the prescribed notice. *Id*. Because the pension fund's interpretation of the relevant language conflicted with the notice term, the Seventh Circuit declined to accept it, notwithstanding the termination of the collective

bargaining agreement. *Id*. Similarly, here, because NIT's interpretation of the Participation Agreement conflicts with the notice provision, which provides that NIT's contribution duties will continue until it gives the prescribed notice, it is rejected. *See also Cent.States v. Depew Dev., Inc.*, No. 95 C 5357, 1997 WL 610318, at *4 (N.D. Ill. Sep. 29, 1997) (concluding that issue of which CBA applied was irrelevant because "nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement" and the participation agreement simply incorporated terms from the CBA) (citation and internal quotation marks omitted).

As NIT admits, it signed and was bound by the Participation and Trust Agreements that require it to pay into the Funds until it is no longer obligated to do so by contract or law *and* provides the Funds with written notice to terminate the Local 722's representative status. Neither NIT nor Local 722 has sent notice of termination to the other, and NIT and its employees continue to pay union dues to Local 722. (Pls.' LR 56.1 Stmt. ¶¶ 27, 29.) Thus, even if the 2006 CBA has expired, the Participation and Trust Agreements provide a separate source for this Court's jurisdiction.

### III.  The Funds' Entitlement to Damages

Under ERISA § 502(g)(2) and applicable language within the Trust Agreements, the Funds are entitled to the following relief: (a) unpaid contributions; (2) interest on unpaid contributions at the rate specified in the Trust Agreements; (3) an amount equal to the greater of (a) the interest on unpaid contributions, or (b) liquidated damages as provided by the Trust Agreements in an amount not to exceed twenty percent (20%) of the unpaid contributions; and (d) reasonable attorneys' fees and costs. Furthermore, pursuant to Article XIV, Section 12 of the Pension Fund's Trust Agreement, Article XI, Section 11 of the Health and Welfare Fund's Trust

Agreement, and Paragraph 10 of the Participation Agreement, NIT is also required to pay all audit fees and costs. *See* 29 U.S.C. 1132(g)(2)(E) (providing that a court shall award "other legal or equitable relief as the court deems appropriate"); *Trs. of Chi. Plastering Inst. Pension Trust v. Cork Plastering Co.*, 570 F.3d 890, 902 (7th Cir. 2009) ("This court, among others, have construed [29 U.S.C. 1132(g)(2)(E)] to include an award of audit costs.").

NIT makes several objections in response to the Funds' statements of the amounts due as determined by the audit. First, NIT maintains that the Court should disregard the Funds' audit because it is hearsay and lacks proper foundation. With respect to the hearsay argument, NIT fails to explain how calculations based on its own records, which it does not contend are inaccurate, constitute hearsay. As noted by the Seventh Circuit, an assertion that a payroll audit is hearsay "is not literally true" as "the report is a long series of tabulations based on [the defendant's] payroll records and . . . does not repeat any out-of-court statements." *See Cork Plastering Co.*, 570 F.3d at 899–900 (discrediting employer's argument that an audit report should have been excluded from evidence as inadmissible hearsay). Moreover, the Seventh Circuit noted that an audit report "would in any event qualify for admission as a summary of voluminous business records—namely [the defendant's] own payroll records." *Id*. at 901 (citing Fed. R. Evid. 1006). With respect to the foundation argument, Peter Priede, Group Manager of the Operations Accounting Group for the Funds, attests that he has personal knowledge of the audit and could testify to the facts set forth in his affidavit regarding the results of the audit. (Priede Aff., Dkt. # 31, ¶ 2.) NIT points to no facts or record evidence refuting this representation; therefore, NIT's objections to the admissibility of the audit are overruled.

NIT also maintains that the amount of reported hours in October 2010 for employees eligible for Health and Welfare Fund contributions is incorrectly reflected in Plaintiffs' Motion

for Summary Judgment. Specifically, NIT claims that eligible employees worked a total number of 368.75 hours in October 2010, rather than the 421.75 hours alleged by the Funds' in their Motion for Summary Judgment. (Def.'s Resp. LR 56.1 Stmt. ¶ 50.) It is apparent that NIT failed to account for 53 hours worked by employees Jeffrey Bushman and Steven Bushman on October 29, 2010, as reflected in Exhibit 7, Page CS001017, of Priede's affidavit. Thus, this Court agrees with Plaintiffs that, according to NIT's self-reported work history, eligible employees worked a total of 421.75 hours in October 2010, not 368.75 hours as NIT asserts.

Furthermore, NIT argues that this Court should apply a $1,000.00 credit to the bottom-line damages amount to reflect two $500.00 payments made in February 2011 and March 2011 to the Health and Welfare Fund. (*Id.* ¶ 56.) However, this discount has already been reflected in the Funds' calculation for unpaid Health and Welfare Fund contributions. (Pls.' LR 56.1 Stmt. ¶¶ 53–54.)

Finally, NIT disputes certain findings reflected in the Funds' audit. NIT denies the audit's findings with respect to (1) unreported work history for the Pension Fund in 2011-12, and (2) unreported work history for the Health and Welfare Fund in 2010-11 and 2011-12.

NIT does not include any hours worked in 2012 by eligible employees in its Pension Fund calculations, which it denied on the ground that no agreement to contribute existed at that time. (*Id.*, Ex. B, Def.'s Resp. to Requests to Admit.) As detailed above, however, NIT has been obligated to pay contributions on behalf of eligible employees pursuant to the unexpired 2006 CBA and the Participation Agreement. Thus, NIT's denials are deemed admitted and this Court agrees with the Plaintiffs that the amount of delinquent Pension Fund contributions should be based on a total of 93 hours worked by eligible employees for 2011 through 2012.

Finally, based on NIT's admissions, eligible employees worked a total of 2,094.50 hours in 2009-10 and 2,050.00 hours in 2011-12.  Therefore, as reflected in the Funds' reply brief, the following work history of eligible NIT employees, as determined by the Funds' audit, is true and accurate:

| TIME PERIOD | PENSION FUND | HEALTH AND WELFARE FUND |
|---|---:|---:|
| 2009–2010 | 60 Weeks | 2,094.50 Hours |
| 2011–2012 | 93 Weeks | 2,050.00 Hours |
| **TOTAL** | **153 WEEKS** | **4,144.50 HOURS** |

Thus, with contribution rates of $162.50 per week for the Pension Fund and $9.05 per hour for the Health and Welfare Fund, NIT owes $24,862.60 to the Pension Fund and $37,507.53 to the Health and Welfare Fund based on the Funds' audit findings and NIT's admissions.

In sum, this Court awards damages to the Plaintiffs in the following amounts, exclusive of attorney's fees and costs:

| DESCRIPTION | AMOUNT |
|---|---:|
| Pension Fund Contributions (Based on NIT's Reported Work History) | $5,687.50 |
| Pension Fund Contributions | $24,862.60 |
| Pension Fund Interest | $4,535.41 |
| Pension Fund Liquidated Damages | $6,528.52 |
| Health and Welfare Fund Contributions | $10,045.53 |
| Health and Welfare Fund Contributions (Based on Audit Findings) | $37,507.73 |
| Health and Welfare Fund Interest (as of February 6, 2013) | $7,372.28 |
| Health and Welfare Fund Liquidated Damages | $9,598.67 |
| Audit Fees | $7,656.50 |
| **TOTAL** | **$113,794.74** |

**CONCLUSION**

For the reasons stated above, the Funds' motion for summary judgment [27-1] is granted. The Funds are awarded $113,794.74 in unpaid contributions, interest on unpaid contributions, liquidated damages, and audit fees.

The Funds are also awarded attorney's fees and costs. The Funds are directed to provide NIT with a statement, including appropriate documentation, of the fees sought within 14 days of the date of entry of this order. In the event that NIT objects to any of the amounts sought, the parties shall meet and confer no more than 14 days after the Funds provide their statement to NIT. In the event that the parties are not able to resolve any disputed issues, they shall provide the Court within 14 days of the meet and confer with a joint statement detailing the disputed issues with authority in support of their respective positions. The Court will rule by mail with respect to the outstanding disputed issues. The parties are directed to make every effort to resolve the fees and costs issues without further Court involvement. Civil case terminated.

**Date**: May 6, 2013

_____

**Ronald A. Guzmàn
United States District Judge**